UNITED STATES

v.

Technical Sergeant Dannie E.
BOLDEN, FR 266–15–5401,
United States Air Force.

ACM 25518.

U.S. Air Force Court of Military Review.

19 Feb. 1987.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Captain Charles L. Wille.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major David F. Barton.

Before SESSOMS, Senior Judge, and STEWART and LEWIS, Appellate Military Judges.

DECISION

STEWART, Judge.

Contrary to his pleas the appellant was convicted by a general court-martial com-

posed of members of six instances of wrongfully distributing cocaine, one instance of possessing cocaine, divers occasions of wrongful use of cocaine, larceny of more than $100.00 in currency from the United States Air Force, and conspiracy to commit the larceny. He was sentenced to a dishonorable discharge, confinement for seven years, total forfeitures, a $5000.00 fine, and reduction to airman basic.

We examine here the assigned error to the effect that the evidence is insufficient to support the findings of guilty of the larceny and conspiracy to commit larceny because the prosecution failed to show that a co-conspirator's marriage was invalid. Part of the prosecution's theory concerning these two offenses was that the appellant arranged a sham marriage between Airman First Class Paul Bahre and Mary W so that Bahre could draw increased allowances from the Air Force as well as rent-plus payments.

The larceny specification merely alleges that the appellant, "did, ... steal United States currency, of a value of more than $100.00, the property of the United States Air Force." On the other hand, the conspiracy specification was more detailed. It alleged the appellant conspired with Bahre and Mary W to steal the currency, "and in order to effect the object of the conspiracy, the said [appellant] and [Bahre], did enter into an Apartment Rental Agreement which inaccurately reflected the dollar amount of the monthly rental payments and which said Apartment Rental Agreement was presented to the Elmendorf Air Force Base Housing Referral Office, did orchestrate a sham marriage between [Bahre] and [Mary W] ... and did provide rental property to [Bahre] in order for [Bahre] to receive with dependent rate BAQ, COLA and Rent Plus entitlements and in order for [Mary W] to obtain military dependent benefits."

The evidence revealed that Bahre desired to live off Elmendorf Air Force Base, and that he had little chance of drawing off base allowance for quarters, increased cost of living allowance, and rent-plus allowance

unless he was married. He discussed this with the appellant, who suggested that Bahre marry Mary W, who was the appellant's girlfriend. Under the marriage terms dictated by the appellant, Bahre was not to consummate the marriage nor live with Mary W, and was not to take her out socially or hold her out as his wife socially, but was to pay her $200.00 or $250.00 per month support. Additionally, Bahre was to rent an apartment in which the appellant had a half ownership for $650.00 per month. Bahre and Mary W complied with marriage formalities required by Alaskan law and went through a marriage ceremony before an Alaskan civil official. The appellant was one of the official witnesses to the ceremony. Bahre never did live with Mary W, but he had believed he was legally married to Mary W. Bahre arranged for Mary W to be issued a dependent's identification card and designated her beneficiary for his service life insurance. Also, Bahre, using a rental agreement executed by himself and the appellant, which falsely stated the rent was $750.00 per month, applied for, and received, basic allowance for quarters at dependents' rates, increased cost of living allowance, and rent-plus payments. The cap on rent-plus was $700.00 per month, so Bahre was receiving $50.00 per month more than the actual rent ($650.00 per month) he was paying. Bahre received the aforementioned allowances and payments from the Air Force for five and a half months.

The appellant argues that the marriage, despite its unusual terms, was valid under Alaska law, and that in military law the validity is determined by the law of the place where it is contracted. *United States v. Richardson*, 4 C.M.R. 150 (C.M.A. 1952). Alaskan statutes concerning marriage were considered by the military judge, but those statutes did not address the situation of a marriage entered into for extremely limited purposes, such as to merely qualify for government benefits. Indeed, if there were no other applicable law, one might conclude this marriage was valid under Alaskan law. Counsel at trial

were unable to produce any additional Alaskan law.

The military judge submitted the marriage validity issue to court members during the instructions on the findings concerning both the larceny charge and the conspiracy charge. He apparently relied upon the United States Court of Appeals decision in *United States v. Lutwak*, 195 F.2d 748 (7th Cir.1952), *aff'd*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, (1953), *reh'g denied*, 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352 (1953). Said the military judge in part:

> If you are not satisfied beyond a reasonable doubt that Airman First Class Bahre did in fact enter a sham marriage, that is an illegal and invalid marriage, with intent to defraud the United States and thus obtain this property, then Airman First Class Bahre did not commit a larceny.... and [the appellant] could not be found guilty of aiding or abetting a larceny.... Now during the course of the trial the issue has been raised as to whether the acts performed by Airman First Class Bahre (sic) and [Mary W] on 14 May 1985 created a valid marriage or not. This issue is of vital importance in your resolution of this case with regard to both the larceny and conspiracy charges which are before you.... a sham marriage is void under the law of this country as against public policy and such a marriage can have no validity. Mutual consent is necessary to every contract and no matter what forms or ceremonies the parties go through indicating the contrary, they do not contract if they do not in fact assent. Marriage is no exception to this rule. If the spouses agree to a marriage only for the sake of representing it as such to the outside world, they have never really agreed to be married at all. They must assent to enter into the relation as it is ordinarily understood and it is not ordinarily understood as merely a pretense or a cover to deceive others.... Since it is undisputed that the license and solemnization requirements were met, you should focus your inquiry on the mutual consent of

the parties and whether or not they did in fact agree to and enter into a marriage contract.

The cases are in conflict as to whether marriages for limited purposes are void. *Hanson v. Hanson*, 287 Mass. 154, 191 N.E. 673 (1934) is typical of those that support the appellant's position that they are valid. There Hanson persuaded his girl friend to marry him so he could retain his wage raise which he had obtained upon the representation he was going to be married. He also told her that he would give her an annulment the next day. The court held that to permit the annulment of a marriage otherwise legal and binding upon mere proof that the parties agreed beforehand to have it annulled would destroy the dignity and lessen the importance of the marriage relation. *Lutwak, supra,* best represents the other point of view. That was an immigration case involving the marriage of U.S. war veterans to aliens. The War Brides Act authorized admission of alien spouses into the United States. Lutwak and two other eligible veterans married aliens for the sole purpose of the latters' admissions into the United States. It was agreed that the marriages would be legally terminated after they had served the purpose. In a prosecution for conspiracy to violate the immigration laws, the United States Court of Appeals, Seventh Circuit, upheld the convictions, finding the marriages void. *See* 14 A.L.R.2d 624–630 for a collection of cases on the validity of marriages for limited purposes. The language of the instructions of the military judge quoted above borrows extensively from the Court of Appeals' opinion in *Lutwak*.

We find the *Lutwak* case is dispositive against the appellant, not for the reasons espoused by the Court of Appeals and the military judge, but for the reasons enunciated by the United States Supreme Court in affirming the conviction. The Supreme Court held that the validity of the marriage was immaterial. Mr. Justice Minton, writing for the Court, stated:

> The petitioners claim that the trial court erred in presuming that the French

law relating to the validity of marriages is the same as American law, and they further contend that even under American law these marriages are valid.

We do not believe that the validity of the marriages is material. No one is being prosecuted for an offense against the marital relation. We consider the marriage ceremonies only as a part of the conspiracy to defraud the United States and to commit offenses against the United States. In the circumstances of this case, the ceremonies were only a step in the fraudulent scheme and actions taken by the parties to the conspiracy. By directing in the War Brides Act that 'alien spouses' of citizen war veterans should be admitted into this country, Congress intended to make it possible for veterans who had married aliens to have their families join them in this country without the long delay involved in qualifying under the proper immigration quota. Congress did not intend to provide aliens with an easy means of circumventing the quota system by fake marriages in which neither of the parties ever intended to enter into the marital relationship; ... The common understanding of a marriage, which Congress must have had in mind when it made provision for 'alien *spouses*' in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations. Such was not the case here, or so the jury might reasonably have found.

*United States v. Lutwak*, 344 U.S. 604, 611, 73 S.Ct. 481, 486, 97 L.Ed. 593 (1953).

The appellant cites *United States v. Diogo*, 320 F.2d 898 (2d Cir.1963) for the proposition that, "[T]he Supreme Court in *Lutwak* did not establish 'a federal standard of marriage validity by which state-created marriages are to be reviewed and reassessed in the Federal Courts.'" The facts in that case were similar to those in *Lutwak*, except the prosecution was for making false statements to immigration authorities concerning marriage and conspiracy to make the false statements, whereas in *Lutwak* the charge under consideration was

conspiracy to defraud the United States. In a two to one decision the Court of Appeals in *Diogo* held that the *Lutwak* doctrine did not apply in a situation where the charges are making false statements and conspiracy to do so, apparently because the defendant's statements that they were married were not false. The dissenting judge stated, "I am unable to perceive why this case is not precisely governed by *Lutwak.* ... In fact the more my brothers protest that there is some (unclear) distinction between the cases, the more they disclose the essential identity." *United States v. Diogo, supra*, pp. 909–910. We agree with the dissent, as did the United States Court of Appeals, Fourth Circuit, in 1985 when it rejected *Diogo* and followed *Lutwak. United States v. Yum*, 776 F.2d 490 (4th Cir.1985). Indeed, the United States Court of Appeals, Ninth Circuit, has held, "... [T]he effect of *Lutwak* is to add to the requirement that the marriage be valid where performed an additional, federal, requirement that the parties must have intended that the marriage be one falling within the Court's definition of the common understanding of marriage." *United States v. Sacco*, 428 F.2d 264, 270 (9th Cir.1970). In any event, what the Court of Appeals was saying in the portion of *Diogo* quoted by the appellant was that the Supreme Court in *Lutwak* did not establish a federal test for determining whether marriages are valid or void. With that we agree.

The only differences we see between *Lutwak* and the case before us are that the former involved the immigration laws of the United States and the latter involves military benefits, and the marriages in the former entailed understandings the marriages would be terminated soon after the purposes had been accomplished, whereas in the latter there is no evidence as to when the marriage would be terminated. These to us are not decisive differences. Indeed, the *Lutwak* doctrine has been extended beyond the immigration statutes and has been applied with equal force to a statutory citizenship situation. *United States v. Sac-*

co, *supra*. While advance understandings regarding early termination are significant, a marriage may nevertheless be a sham without such understandings under the *Lutwak* doctrine, "... [I]f the bride and groom did not intend to establish a life together at the time they were married." *Pena-Urrutia v. Immigration and Naturalization Service*, 640 F.2d 242 (9th Cir. 1981).

■ We are confident that Congress, in enacting the basic entitlement statutes, and the Executive Department, in issuing the implementing regulations, intended that military benefits be extended to service members and spouses who have undertaken to establish a life together and assume the normal duties and obligations of marriage. Failure to apply the Supreme Court's doctrine in *Lutwak* would encourage empty marriages designed merely to gain military benefits and would countenance fraud upon the United States. While the military judge adopted a theory of void vis-a-vis valid marriages in his instructions to the court members, we believe the instructions were sufficient, taken as a whole, to require the court members to find facts embracing the Supreme Court's *Lutwak* doctrine if they were to convict. Thus, we find no prejudice to the appellant in this regard in the military judge's instructions.

■ We hold that a marriage entered into with the understanding of the parties that they will not live together nor assume the normal duties and obligations of marriage and for the sole purpose of gaining military benefits contingent upon marriage, constitutes a fraud against the United States when utilized by either party, or both, as the basis for applying for and receiving such military benefits. Such a marriage cannot defeat a prosecution for larceny of the value of such benefits or for conspiracy to steal such benefits. The evidence in this case was sufficient to support the findings of guilty of larceny and conspiracy to commit larceny under this theory.

■ There is, nevertheless, another reason why the evidence is sufficient to support the convictions of larceny and conspiracy. The prosecution advanced the theory, there was sufficient supporting evidence, and the military judge instructed upon it, that the larceny could be independently supported by the overstated rental agreement and the $50.00 a month Bahre received because of that falsity. The conspiracy specification specifically alleged that as a overt act. Since the court found the appellant guilty of the conspiracy *without exceptions*, they implicitly found that the larceny did additionally occur in that manner.

We have examined the record of trial, the assignment of error, the government's reply thereto, and the matters personally submitted by the appellant and conclude that the findings and sentence are correct in law and fact and that no error prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings and sentence are

AFFIRMED.

Senior Judge SESSOMS and Judge LEWIS concur.